Abigail PADOU, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 09–CV–1331.

District of Columbia Court of Appeals.

Argued Nov. 19, 2010.
Decided Oct. 20, 2011.

REID, Associate Judge, Retired:

This case involves Freedom of Information Act ("FOIA") requests sent to two District of Columbia agencies by appellant, Abigail Padou.[1] Ms. Padou asked for specified information about mental health-related community residential facilities ("MHCRFs") and disability care-related facilities located in the District's Ward 5, including the addresses of those facilities. The District withheld certain information and Ms. Padou filed a complaint in the trial court. Ms. Padou mainly asserts on appeal that the trial court erred by granting summary judgment in favor of the District. For the reasons stated in this opinion, we affirm the trial court's judgment with respect to Ms. Padou's Department of Mental Health ("DMH") FOIA request, but we reverse and remand its judgment regarding Ms. Padou's Department on Disability Services ("DDS") FOIA request for further proceedings.

Abigail Padou, pro se.

David A. Hyden, Assistant Attorney General, District of Columbia, with whom Peter J. Nickels, Attorney General at the time the brief was filed, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief for appellee.

Before THOMPSON, Associate Judge, REID,[*] Associate Judge, Retired, and PRYOR, Senior Judge.

## FACTUAL SUMMARY

Ms. Padou's amended complaint, signed on July 20, 2009 and filed in the trial court, shows that on February 10, 2009, she lodged two FOIA requests with District agencies, one with DMH and the other with DDS.[2] She sought "information about community-based mental health-related facilities (MHCRFs) [and community-based disability care-related facilities] located in Ward 5," specifically, the number of such facilities, their addresses and contact infor-

---

[*] Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on April 7, 2011.

[1]. Ms. Padou is the editor of a bi-monthly community newspaper, the *Brookland Heartbeat,* which is circulated to approximately 10,-000 residents and businesses in the Ward 5 Brookland neighborhood, in the Northeast quadrant of the District of Columbia.

[2]. DMH serves persons with mental illnesses. DDS is divided into two Administrations: (1) the Developmental Disabilities Administration which concentrates on persons with intellectual disabilities, and (2) the Rehabilitation Services Administration which services individuals with physical or mental impairments under the Vocational Rehabilitation Program.

mation, a description of the services provided, and their capacity.[3]

On March 4, 2009, DMH sent Ms. Padou a one-page statement entitled, "DMH Mental Health Rehabilitative Services Providers in Ward 5." However, DMH stated that it was "withholding the addresses of mental health community residence facilities under the authority of D.C. [ ] Code § 2–534(a)(2) because the public disclosure of this information would constitute a clearly unwarranted invasion of the personal privacy of the mental health residents residing at these homes." [4]

In contrast to DMH's response to Ms. Padou's request, DDS sent a communication to her on March 4, 2009, providing "a partial list of disability-care related facilities located in Ward 5." The partial list, with identifying information that included the address, contact person, and telephone number, covered " 'licensed' group homes of four or more individuals and intermediate care facilities for persons with mental retardation ('ICFs/MR')." Later, on May 1, 2009, DDS released an additional list of residential facilities in Ward 5, which reflected "each type of residential placement in Ward 5 (i.e., independent living, supervised apartments, host homes, group homes, CRFs, ICFs/MR, and supervised living arrangements)." However, DDS withheld the street addresses and contact information under the FOIA's personal

privacy exemption, D.C.Code § 2–534(a)(2).

Ms. Padou filed an appeal of DMH's decision in the Mayor's office, in accordance with D.C.Code § 2–537 governing appeals. DMH's April 9, 2009, answer to the appeal asserted, in part, that "[a]ll MHCRFs in the District are privately owned," and that because all MHCRF residents must have "a mental illness as a condition of residing in a MHCRF, the public disclosure of all MHCRF addresses would necessarily disclose to the world a very private and sensitive fact about all of the residents residing there, i.e. that they have a mental illness." Moreover, DMH claimed that the disclosure of the information would "violate the purpose of the [District of Columbia] Mental Health Information Act," D.C.Code §§ 7–1201.01 to – 1208.07 (2001), and would "present[ ] the risk[ ] that the MHCRFs or their residents will be unfairly targeted by criminals, subjected to harassment, or other intrusions by members of the community (or the press) by virtue of their mental illness." [5] Nevertheless, DMH supplemented its prior disclosure by releasing "the name of all MHCRF operators, the zip code of each facility, the date of license expiration, the number of authorized occupants, the types of license and whether the operator is a contractor or independent." But, DMH

---

**3.** A MHCRF is "a publicly or privately owned residence that houses individuals, eighteen (18) or older, with a principal diagnosis of mental illness and who require twenty-four hour (24 hr.) onsite supervision, personal assistance, lodging, and meals and who are not in the custody of the District of Columbia Department of Corrections." 22–B DCMR § 3800.2 (2009). All Ward 5 MHCRFs are privately owned, but are licensed and subject to supervision by the District government.

**4.** Under § 2–534(a)(2) "[i]nformation of a personal nature where the public disclosure thereof would constitute a clearly unwarrant-

ed invasion of personal privacy" "may be exempt from disclosure. . . . "

**5.** D.C.Code § 7–1201.02(a) provides that:

Except as specifically authorized by subchapter II, III, or IV of this chapter, no mental health professional, mental health facility, data collector or employee or agent of a mental health professional, mental health facility or data collector shall disclose or permit the disclosure of mental health information to any person, including an employer.

stated that: "The addresses and telephone numbers [of the MHCRFs] have been redacted pursuant to D.C.Code § 2–534(a)(4)."

On May 27, 2009, the Mayor's Office granted Ms. Padou's appeal and reversed DMH's decision not to disclose the addresses of the MHCRFs. The Mayor reiterated the public policy articulated in D.C.Code § 2–531, "all persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees." The Mayor concluded that Ms. Padou's request did not "relate to any personal information" about individual MHCRF residents, but that it "relate[d] to the treatment facilities and the services they provide"; and thus, the residents' "privacy interests ... were not implicated by Ms. Padou's FOIA." Furthermore, the Mayor determined that there would be no violation of the Mental Health Information Act because "the disclosure of the addresses of a mental health community residence facility does not fall within the definition of mental health information as described by the [ ] Mental Health Information Act."

Ms. Padou also appealed DDS's May 1, 2009, decision to withhold street addresses and contact information from its second response to her FOIA request. DDS responded on June 9, 2009, in a six-page letter, and summarized its position as follows:

There can be no question that the information sought by Ms. Padou's FOIA request, the "addresses and contact information associated with community-based facilities overseen by DDS in Ward 5," is of a personal nature and therefore not subject to disclosure in accordance with the exemption in D.C. [ ] Code § 2–534(a)(2). The information is protected by the Mental Health Information Act and the Mentally Retarded Constitutional Rights and Dignity Act in accordance with D.C. [ ] Code § 2–534(a)(6) ["[i]nformation specifically exempted from disclosure by statute"], though this exemption was not specifically cited in either FOIA response to Ms. Padou. The purpose for which Ms. Padou seeks the information is both immaterial and irrelevant in these circumstances and, in any event, the privacy interests served by the statute far outweigh her tenuous attempt at asserting a public interest in disclosure.

Attached to DDS's answer to Ms. Padou's appeal was a declaration of the Director of Operations for the Developmental Disabilities Administration ("DDA").[6] As a basis for withholding certain information on May 1, 2009, including addresses and telephone numbers for providers, the Director mentioned the personal privacy exemption in D.C.Code § 2–534(a)(2), privilege and confidentiality as reflected in both the goals of the Mentally Retarded Citizens Constitutional Rights and Dignity Act, and § 7–1305.12 of that Act.[7]

DMH filed a request for reconsideration of the Mayor's decision on June 2, 2009, explaining that the MHCRFs "are private homes for an average of 6–8 persons"; that disclosing the addresses and therefore revealing that each resident suffered from a mental illness requiring twenty-four hour supervision and assistance, would "force

---

6. DDS is composed of two entities—DDA, and the Rehabilitation Services Administration which assists those with physical and mental health disabilities.

7. D.C.Code § 7–1305.12(a) specifies, in part: "All information contained in a customer's records [in the Department on Disability Services] shall be considered privileged and confidential."

[MHCRF residents] to forfeit the anonymity that the District provides to non-disabled single family residents across the District." DMH also asserted that as a result of a lawsuit against the District by the Department of Justice involving the Fair Housing Act ("FHA") and the Americans With Disabilities Act ("ADA"), the District had modified its zoning requirements and now "treats group homes serving the disabled no differently from the way it treats a home housing six college students." With respect to the Mental Health Information Act, the District "readily acknowledge[d] that the addresses [of the MHCRFs] do not *ipso facto* disclose the identity of mental health consumers," but that release of the addresses would "disclose a very private fact about all of these residents," that is, their mental illness. Finally, the District emphasized its "long history of protecting the addresses where [the] most vulnerable and ill residents reside."

On June 11, 2009, while DMH's request for reconsideration was still pending, Ms. Padou filed her complaint against DMH for violations of the District's FOIA.[8] Subsequently, on July 8, 2009, the Mayor's office released its decisions pertaining to Ms. Padou's administrative appeals. The Mayor's office vacated its May 27th order and agreed with DMH that disclosing the addresses of the MHCRF facilities would constitute an unwarranted invasion of privacy for each resident, essentially for the reasons articulated by the District in its

April 9, 2009 response to Ms. Padou's appeal. As for the DDS appeal, the Mayor's office pointed out that "[d]isclosing the[ ] addresses [of the residential facilities for the mentally retarded] would inform the public of where the intellectually disabled reside and could potentially thwart the District's effort to house these individuals in an accepting and welcoming community," and hence would violate their privacy rights.[9] In addition, the Mayor's office declared that: "the disclosure [of the street addresses and contact information] would violate the spirit of the District of Columbia Mental Health Information Act ... and the Mentally Retarded Citizens Constitutional [Rights] and Dignity Act ..., which both serve to ensure that those with intellectual disabilities are treated fairly and allowed to assimilate into their surrounding communities." Ms. Padou filed an amended complaint in the trial court on July 20, adding a claim against DDS and indicating that although DDS had provided lists of community-based disability facilities in Ward 5 to her, the agency withheld the addresses of these facilities pursuant to D.C.Code § 2–534(a)(2).[10]

The District filed a motion for summary judgment on August 18, 2009, which essentially repeated the same arguments made in the administrative proceedings—that the FOIA requests sought information that is exempt from disclosure under § 2–534(a)(2), the personal privacy exemption.[11]

---

8. D.C.Code §§ 2–531 to –540 (Supp.2010).

9. As authority for not disclosing the requested information, the Mayor's office relied on the personal privacy exemption from disclosure, but cited D.C.Code § 2–532(a–2). The office undoubtedly meant to cite § 2–534(a)(2), as it had done earlier in its decision, since § 2–532(a–2) concerns an agency's search for records and its automated information system.

10. According to Ms. Padou's amended complaint, "DDS had previously provided this information for some facilities in DDS's March 4, 2009 response to [her] FOIA request."

11. The District argued that MHCRFs are "intended to function to the extent possible as any other residential home in the community." 22–B DCMR § 3802.1 provides that "[n]o MHCRF shall use a name on the exterior of the facility or display any logo that

In support of its motion, the District filed a memorandum of points and authority, a statement of undisputed material facts, and an affidavit from a supervisory health systems specialist describing the MHCRFs, indicating the information turned over to Ms. Padou, and explaining the redaction of the addresses, telephone and fax numbers of the facilities in Ward 5. The District also attached other agency documents relating to Ms. Padou's FOIA request, including its May 1, 2009, settlement agreement with the Department of Justice in the case of *United States v. District of Columbia*, 538 F.Supp.2d 211 (D.D.C.2008) (pertaining to Civil Action No. 04–0619(JR)).

Ms. Padou filed her opposition to the District's summary judgment motion on September 4, 2009. She identified "[t]he nature of community-based mental health and disability care facilities" as a "material fact[ ] still in dispute." In that regard, although the District claimed that the community residential facilities (for those who are mentally ill, intellectually challenged or disabled) are "indistinguishable from surrounding homes," Ms. Padou maintained that "these facilities are businesses overseen and licensed by the District of Columbia and that the nature of their operations makes their character known to neighbors and passers-by." Ms. Padou submitted a memorandum of points and authorities in support of her opposition, as well as her

own affidavit and an affidavit of Don Padou.[12]

The trial court granted summary judgment in favor of DMH and *sua sponte* granted summary judgment in favor of DDS, despite the fact that DDS had not filed a motion for summary judgment. The court found that "[p]resently, twenty-two MHCRF's operate in Ward 5 and house approximately 130 individuals," and that these residences have no identifying words or logos on the exterior of the premises. The court further determined that Ms. Padou, the editor of the *Brookland Heartbeat*, sought information from DMH "because she wishes to publish a story regarding the presence of MHCRFs in Ward 5." After examining case law, particularly federal case law interpreting the corresponding federal personal privacy exemption, the court first declared that disclosure of the addresses of the MHCRFs would violate D.C.Code § 2–534(a)(2):

> The [c]ourt concludes that revealing the address of each MHCRF is the type of information exempt from disclosure under § 2–534(a)(2). This information is exempt because granting the request would reveal that individuals residing within MHCRFs—residences that are otherwise indistinguishable from other homes—have a mental disability and that they are dependent upon twenty-four hour medical assistance. Moreover, revealing the address and hence the identity and location of those individ-

---

distinguishes [it] from any other residence in the neighborhood." To that end, the District claimed that "the residents of the MHCRFs enjoy the same privacy in their personal lives as their neighbors in the community, with their homes bearing no characteristics to distinguish them from other homes in their neighborhood." Thus, it argued that Ms. Padou sought "to pierce this veil of privacy by seeking the home address and contact information for each of the MHCRFs in Ward 5."

12. The affidavits attempted to show, in part, that Ward 5 residents were well aware of the existence of mental health care and disability care facilities in their neighborhoods, and had made complaints to facility operators about the conduct of staff, patient abuse, and "incidents of dangerous or inappropriate patient behavior." Ms. Padou stated that DDS's initial disclosure of facility addresses and telephone numbers "has not led to any harassment or physical harm to the patients."

uals with mental disabilities could expose them to solicitation, harassment or other embarrassment. Accordingly, the [c]ourt concludes that the plaintiff's request falls under § 2–534(a)(2).

The court balanced the public interest against the privacy interest and decided that the privacy interest was more important:

> In this case, the [c]ourt concludes that the public interest in disclosing the specific address of each MHCRF is minimal—particularly when considering the extensive disclosures defendant already has provided. The defendant already has turned over to plaintiff (1) information pertaining to all mental health rehabilitative service providers in Ward 5, (2) the names of all MHCRF operators for each facility, (3) the zip code of each MHCRF in Ward 5, (4) the date of license expiration of each MHCRF, (5) the number of authorized occupants, (6) the type of license, and (7) whether the operator is a contractor or works independently. Indeed, plaintiff has an abundance of information to investigate the nature of defendant's performance and how such performance comports with defendant's statutory duties.

> In contrast, the privacy interests of the individuals who reside in each MHCRF are significant. This is because those individuals would be revealed as suffering from a mental illness and having extensive medical needs. In addition to the interest in medical privacy, the [c]ourt notes the affected individual's interest in not disclosing their home address and thereby inviting harassment, embarrassment, or ridicule. As a result, the [c]ourt cannot conclude—nor does plaintiff clearly articulate—how disclosing the specific address of each MHCRF clearly advances a public interest that outweighs the privacy interests in nondisclosure.

Furthermore, although the trial court was "troubled" by the District's failure to file an affidavit with respect to Ms. Padou's DDS FOIA request, it declared that the DDS issue was "moot" because Ms. Padou described the issue in that matter as "similar" and "[i]t would be an exercise in futility to have defendant file a similar motion on DDS'[s] behalf in light of the [c]ourt's determination that the specific address of each MHCRF is exempt from disclosure under § 2–534(a)(2)." The court also stated that Ms. Padou did not "indicate[ ] that she has been denied any special information requested only from DDS." Finally, the trial court saw no material factual dispute precluding summary judgment, that the affidavits from Ms. Padou and Mr. Padou "d[id] not rise to the level of material facts making summary judgment improper." As the court put it:

> Simply because one can discern that a particular residence may be an MHCRF does not necessarily compel the conclusion that all MHCRFs in Ward 5 are equally as obvious. Nor does discovering the location of one MHCRF thereby moot the expectation of privacy belonging to the individuals residing in the twenty-two MHCRFs dispersed throughout Ward 5.

## ANALYSIS

Ms. Padou mainly argues that the trial court erred by granting summary judgment as a matter of law in favor of the District on both the DMH and DDS FOIA requests.

### *The DMH Summary Judgment and the Personal Privacy Exemption Issue*

■ Ms. Padou claims that the personal privacy exemption under the District's FOIA does not apply to this case because she has requested business addresses,

which are not "personal information" within the meaning of FOIA. She argues that the District's concern that the addresses may lead to the disclosure of the residents' mental health diagnosis is "a secondary effect" that is "highly speculative"; and that even if a third party were to know that MHCRF residents suffer from mental illnesses, without names, that information is not an invasion of the residents' privacy. In addition, Ms. Padou takes issue with the trial court's conclusion that the privacy interest of MHCRF residents outweighs the public interest in the disclosure of the MHCRF addresses. She asserts that the District's licensing of an "unknown number of [MHCRFs] to provide mental health and disability care ... makes regulation and oversight difficult"; and that "[t]he very fact that the District is creating this dispersed system [of mental health care giving] is of public interest" because "[t]he location of these business facilities is just a starting point for understanding what the government is up to in this area." Consequently, she states that she, not the District, is entitled to summary judgment.

The District argues that the trial court correctly granted summary judgment in its favor because Ms. Padou requested personal information exempt from disclosure under D.C.Code § 2–534(a)(2). The District insists that disclosing MHCRF addresses would result in a "clearly unwarranted invasion of privacy" that outweighs any public interest in disclosure, and disclosure also would violate the District's Mental Health Information Act. The District contends that "the fact that no specific individual is named in a FOIA request does not mean that privacy interests are not implicated, particularly when disclosure of the sought information would easily lead to the revelation of more information about individuals touched by the disclosure."

■ We are called upon to review the trial court's decision to grant the District's motion for summary judgment in this FOIA case. "Summary judgment is appropriate only when the record, including 'pleadings ... together with affidavits,' indicates that there is no genuine issue as to any material fact and that 'the moving party is entitled to judgment as a matter of law.'" *Doe v. District of Columbia Metro. Police Dep't,* 948 A.2d 1210, 1220 (D.C. 2008) (quoting *Smith v. Washington Metro. Area Transit Auth.,* 631 A.2d 387, 390 (D.C.1993); Super. Ct. Civ. R. 56(c)).

We recognize the broad disclosure policy of the District government that is reflected in the FOIA, as well as the mandate to construe the statutory disclosure provisions liberally and the statutory exemptions from disclosure narrowly. D.C.Code § 2–531 ("The public policy of the District of Columbia is that all persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees."); *Riley v. Fenty,* 7 A.3d 1014, 1018 (D.C.2010). That is why D.C.Code § 2–537(b) not only places the burden on the administrative agency "to sustain its action," but also authorizes this court to review the agency's withholding of requested FOIA information *de novo. Cf. Wemhoff v. District of Columbia,* 887 A.2d 1004, 1007 (D.C.2005) (reviewing disclosure and exemption arguments *de novo* because they required statutory interpretation).

■ As in *Wemhoff,* the DMH FOIA requires us to consider more than one statutory provision; we must take into consideration the FOIA, the Mental Health Information Act, and related statutes. "'Statutory construction is a holistic endeavor, and, at a minimum, must account for a statute's full text, language ..., structure, and subject matter.'" *Id.* (quoting *District of Columbia v. Beretta,*

*U.S.A. Corp.,* 872 A.2d 633, 652 (D.C.2005) (en banc)) (internal quotation marks and citation omitted). " '[I]f divers[e] statutes [or regulations] relate to the same thing, they ought all to be taken into consideration in construing any one of them.' " *Id.* at 1008 (quoting *Luck v. District of Columbia,* 617 A.2d 509, 514 (D.C.1992)) (internal quotation marks and citation omitted). Furthermore, the "disclosure of a list of names and other identifying information is [not] inherently and always a significant threat to the privacy of the individuals on the list"; and "whether disclosure of a list of names is a 'significant or a *de minimis* threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue.' " *United States Dep't of State v. Ray,* 502 U.S. 164, 176 n. 12, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991) (quoting *National Ass'n. of Retired Fed. Emps. v. Horner,* 279 U.S.App. D.C. 27, 31, 879 F.2d 873, 877 (1989)) (internal quotation marks omitted).

Here, the central issue is whether the DMH properly withheld the addresses of MHCRFs in Ward 5 under the personal privacy exemption, despite the statutory directive in D.C.Code § 2–531 to construe the FOIA "with the view toward expansion of public access...." The underlying premise of Ms. Padou's argument is that the MHCRFs are "businesses" or, as she says in her affidavit, "healthcare enterprises whose operations are visible to neighbors and passers-by"; she emphasizes that she has not requested the address of any individual.

Statutory and regulatory provisions provide insight into the character of MHCRFs. D.C.Code § 44–501(a)(4) (Supp.2011) defines "[c]ommunity residence facility" ("CRF") as "a facility that provides a sheltered living environment for individuals who desire or need such an environment because of their physical, mental, familial, social, or other circumstances, and who are not in the custody of the Department of Corrections." The living arrangement or environment of those in CRFs, especially the mentally ill, is inextricably tied to their status as persons in need of assistance because of a mental or physical disability. Consequently, as the MHCRF regulations specify: "A MHCRF shall be a publicly or privately owned *residence* that houses individuals ... with a principal diagnosis of mental illness and who require ... on site supervision, personal assistance, lodging, and meals...." 22–B DCMR § 3800.2 (emphasis added).

Moreover, persons living in a mental health residence have the right to the confidentiality of all mental health information that could identify them. *See* D.C.Code § 7–1201.01(9) (defining "[m]ental health information" as including "any written, recorded or oral information acquired by a mental health professional ... which: (A) [i]ndicates the identity of a client ...."); *see also* 22–B DCMR § 3801.10 ("Each resident shall have the right to have his or her treatment record and all information contained therein kept confidential in accordance with the Mental Health Information Act...."); D.C.Code § 7–1201.02(a) (generally prohibiting "the disclosure of mental health information to any person...."). Significantly, a street address of a MHCRF constitutes identification data because "the characteristic[ ] revealed by virtue of being [at that] particular [address]" is mental illness; that is, that each person who resides at that address is mentally ill. *See Ray, supra,* 502 U.S. at 176 n. 12, 112 S.Ct. 541.[13]

---

**13.** A person who has knowledge of the type of residence may also gain at least some insight into the extent of the mental illness. For example, a person in an "[i]ntensive [r]esi-

To reiterate, we are faced with a situation where the FOIA embodies in D.C.Code § 2–531, a policy favoring disclosure of "full and complete information regarding the affairs of government and the official acts of ... public officials and employees," but a limitation in D.C.Code § 2–534(a)(2) on the disclosure of "[i]nformation of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy[.]" We are guided by federal FOIA law which "we ... treat[ ] ... as instructive authority with respect to our own [FOIA]" pertaining to similar provisions. *Doe, supra*, 948 A.2d at 1220 (quoting *Washington Post Co. v. Minority Bus. Opportunity Comm'n*, 560 A.2d 517, 521 n. 5 (D.C.1989)) (internal quotation mark and citation omitted). We have long held that the District's FOIA statute "is modeled on the corresponding federal statute, 5 U.S.C. § 552...." *Hines v. District of Columbia Bd. of Parole*, 567 A.2d 909, 912 (D.C. 1989); *see also Washington Post Co., supra*, 560 A.2d at 521 n. 5; *Barry v. Washington Post Co.*, 529 A.2d 319, 321 (D.C. 1987) (per curiam). Federal FOIA law, specifically 5 U.S.C. § 552(b)(6) (2006), contains an exemption for "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]"

▮ Following the federal approach, "[w]e apply a balancing test to determine whether disclosure would constitute a clearly unwarranted invasion of personal privacy under" D.C.Code § 2–534(a)(2), that is, we "balance the public interest in disclosure against the [privacy] interest Congress [and the Council of the District of Columbia] intended the [e]xemption to protect." *See Forest Guardians v. FEMA*, 410 F.3d 1214, 1217–18 (10th Cir. 2005) (alteration in original) (quoting *United States Dep't of Defense v. FLRA*, 510 U.S. 487, 495, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994)) (internal quotation mark and citation omitted). The public interest that is safeguarded by the FOIA is the right to obtain "full and complete information regarding the affairs of government and the official acts of ... public officials and employees," D.C.Code § 2–531, whereas the privacy interest that is "protect[ed]" under D.C.Code § 2–534(a)(2) "encompass[es] the individual's control of information concerning his or her person," including his or her "name and home address." *See Forest Guardians, supra*, 410 F.3d at 1218 (quoting *FLRA, supra*, 510 U.S. at 500, 114 S.Ct. 1006) (internal quotation marks and citation omitted).

We conclude that on this record, DMH has sustained its "burden of defending [its] decision to withhold production of [the] requested" addresses of MHCRFs in Ward 5. *Riley, supra*, 7 A.3d at 1018 (citing D.C.Code § 2–537(b)).[14] The substantial privacy interest of the mentally ill, who reside in Ward 5 MHCRFs, in protecting themselves from the continuing stigma of mental illness in our society outweighs the public interest, championed here by Ms. Padou, to know "what the

---

dence" may require more mental health services or mental health support than a person in a "[s]upported [r]esidence." *See* 22–B DCMR §§ 3835, 3837.

14. We note that this is not a case in which DMH denied all information about MHCRFs to Ms. Padou. As the trial court noted, after initially providing only one page of information in response to the FOIA request, DMH subsequently provided additional information about the MHCRFs, including "the names of all MHCRF operators for each facility," "the type of license [and] the date of license expiration," and "the zip code of each residence."

government is up to" in those MHCRFs.[15] Disclosure of the addresses could result in harassment and ridicule, or "unwanted intrusions" of MHCRF residents by those who are not sensitive to, nor understanding of, mental illness, and hence, disclosure of the addresses "would interfere with the [residents'] reasonable expectations of undisturbed enjoyment in the solitude and seclusion of their own homes" as the non-mentally ill residents attempt to find out what is happening inside and outside the premises. *See National Ass'n of Retired Fed. Emps.,* supra, 279 U.S.App. D.C. at 30, 32, 879 F.2d at 876, 878.[16] In short, we see no need to disturb the trial court's judgment regarding Ms. Padou's DMH FOIA request.

### The DDS Summary Judgment Issue

 The trial court disposed of the DDS FOIA request by saying: "While the [c]ourt is troubled by defendant's oversight in failing to file a responsive affidavit as to ... DDS, the [c]ourt concludes that the remaining issue regarding DDS is moot," because "[i]t would be an exercise in futility to have defendant file a similar motion on DDS' behalf in light of the [c]ourt's determination that the specific address of each MHCRF is exempt from disclosure under § 2–534(a)(2)." Given the burden on DDS to defend the withholding of additional addresses of disability care facilities for the mentally retarded, and its initial disclosure of the addresses of numerous group homes for mentally retarded persons, we are also "troubled" by the District's failure to provide an affidavit in support of its DDS position. At the same time, it is not clear to us that the intellectually disabled bear the same stigma as the mentally ill, especially in light of soci-

15. The affidavits of the Padous do not specifically identify information they seek regarding the operations of the MHCRFs or official actions of government officials and employees. Rather, the affidavits show that they seek to prove that the MHCRFs are businesses or "small commercial healthcare facilities," that this fact is "obvious," and hence, should not preclude the disclosure of the addresses of the MHCRFs. Yet, applicable statutory and regulatory provisions describe the MHCRFs as living arrangements or residences for the mentally ill, and there are diverse living arrangements, including "[s]upported [r]esidence[s]" in "a homelike setting." 22–B DCMR § 3835.1. Furthermore, the pertinent inquiry here in terms of the public interest is "the extent to which disclosure [of the MHCRF addresses] would contribute to the 'public understanding of the operations or activities of the government,' not the interests of the requesting party." *Trentadue v. Integrity Comm.,* 501 F.3d 1215, 1233 (10th Cir. 2007) (quoting *FLRA,* supra, 510 U.S. at 495, 114 S.Ct. 1006). Nevertheless, Ms. Padou's affidavit mentions matters of concern pertaining to three MHCRFs near her home, including passenger vans "stand[ing] outside the facilities with their engines idling," parking by numerous passenger vans and staff cars, noise from blowing automobile horns, and the bizarre and dangerous behavior of one resident outside the facility. Mr. Padou's affidavit discusses similar incidents. But Ms. Padou also states that "when necessary," others who live in the community "make complaints to the facility operator about the conduct of the facility staff; report incidents of patient abuse to the District of Columbia, and report incidents of dangerous or inappropriate patient behavior to the facility operator." [App 24, 28–29] These affidavits provide insight into other ways, short of comprehensive disclosure of the addresses of all MHCRFs, in which neighborhood communities can monitor these mental health community residences and take action in the public interest.

16. Disclosure of the MHCRF addresses to Ms. Padou would result in disclosure to the entire public. As the Supreme Court has stated: "It must be remembered that once there is disclosure, the information belongs to the general public. There is no mechanism under FOIA for a protective order allowing only the requester to see whether the information bears out his [or her] theory, or for proscribing its general dissemination." *National Archives & Records Admin. v. Favish,* 541 U.S. 157, 174, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004).

ety's increasing understanding that not all intellectual disabilities interfere with the ability to function in the larger society. We think that the better course is to remand the DDS matter to the trial court so that it may consider whether DDS has sustained its statutory burden to defend the withholding of street addresses and contact information in its May 1, 2009, disclosure of residential placements in Ward 5.[17]

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court with respect to Ms. Padou's DMH FOIA request, but we reverse its judgment regarding the DDS FOIA request and remand that matter for further proceedings.

*So ordered.*

---

17. Ms. Padou claims that the trial court erred in denying her additional discovery to oppose the District's motion for summary judgment, and that the District failed to comprehend her discovery argument. "We review a trial court's denial of a request for discovery premised on a [Super. Ct. Civ.] Rule 56(f) affidavit for abuse of discretion." *Flax v. Schertler,* 935 A.2d 1091, 1102 (D.C.2007). "We may reverse a trial court's ruling on discovery issues only if the ruling goes beyond the reasonable exercise of discretion." *Clampitt v.*

*American Univ.,* 957 A.2d 23, 28 (D.C.2008). For the reasons set forth above in the discussion of the DMH summary judgment motion and in note 15, *supra,* we discern no abuse of discretion with respect to the denial of further discovery pertaining to Ms. Padou's DMH FOIA request. Whether Ms. Padou has made a sufficient showing in her Rule 56(f) affidavit for further discovery from DDS is an issue entrusted, in the first instance, to the discretion of the trial court on remand.